HAWKEYE PORTLAND CEMENT COMPANY, Appellee, v. W. H. WILLIAMS et al., Appellants.

No. 41071.

NOVEMBER 24, 1931.

C. A. Robbins and Thos. J. Guthrie, for appellee.

Percival & Wilkinson, for appellant.

GRIMM, J.—The Hawkeye Portland Cement Company, hereinafter, for brevity, called the "Cement Company" or "Company," has since and prior to 1923 owned an extensive cement plant which lies immediately across the road from land belonging to the defendants (appellants). The cement company has extensive improvements on its property, which said improvements are immediately adjacent to the public highway and immediately across the public highway from the barns, sheds, feed lots and other farm improvements on the farm owned by the defendants. It appears that at times there are as many as 200 employees who work on the premises of the cement company. There are no buildings in the vicinity for a quarter of a mile or more, other than those of the cement company and farm buildings on defendants' farm across the road. The cement company buildings are on the south side of an east and west public highway and the farm in question is on the north side. The particular portion of the farm in controversy is what is known as the feed lot. In it are two springs, one known as the north spring

and the other as the south spring. As these springs flowed naturally, the water passed down a ravine in a southwesterly direction, across the road onto the property of the cement company, in close proximity to and immediately west of its main buildings.

Prior to 1923, the cement company had constructed a dam across this outlet of the springs, thereby creating a pool out of which it procured the water for its boilers. The springs were approximately 8 or 10 rods apart, and it was about 15 rods from the point where the water of the two springs came together, to the public highway on the south.

One Spatz, who owned the farm in 1923 and prior thereto, had piped the south spring out to a tank, and he had dug a reservoir around the north spring, installing a cement curb. The stock in the feed lot drank out of this reservoir. The overflow of the water from each of the springs passed down the ravine across the road and onto the property of the plaintiff.

One Prohaska was at that time managing officer and agent of the plaintiff company. Prohaska and Spatz talked about the overflow water and the use thereof by the plaintiff company. It was finally agreed between the parties, in substance, as follows: That the water from both springs should go into one tank. The farmer was to have the first use of all the water and the overflow was to be piped down the natural ravine to the plaintiff's property to be by them used for any and all purposes. The cement company built a tank and laid the pipe to their premises. A pump was put in the south spring by the farmer.

It also appears that the barn on the farm was west of the north spring, and there was a shed west of a point midway between the north and the south spring. The dwelling house on the farm was north and west of the north spring, but apparently water was carried from the south spring to the farmhouse for use in the farmhouse.

It seems that at the time of the installation of the tank and piping hereinbefore referred to by the plaintiff, people were in the habit of passing from the highway into the farmer's feed lot and taking water from the south spring. For a time the water was taken from the spring by a bucket. Later, a cover was put on the spring, and still later, the plaintiff built up a cement platform, rounding in form, two or three feet in height,

on the top of which was placed a pump. As the employees of the cement company passed from the buildings of the cement company across the road into the feed lot to this pump, they at first used a gate, or other passageway through the fence. Afterwards, the farmer built a substantial fence, and over it he constructed steps by which persons could easily pass over the fence.

There were renewals or repairs to different parts of these tanks, pipes and other structures, made at different times, some of the renewals and repairs to the pump on the south spring having been made by the farmer, others by the cement company.

The cement company employees continued to use these steps to the south spring and to get water therefrom. There is also evidence to the effect that the public at times proceeded over these steps and down the path to the spring, where they procured water. The use thus made of the south spring, principally by the employees of the plaintiff company, created a well-defined pathway from these wooden steps over the fence to the pump at the south springs. This path was so much used and so well worn as to remove entirely all vegetation therefrom and to cause a depression, varying in depth. The steps were in plain sight and plainly visible to anyone passing along the highway. There was a slight decline from the foot of the steps north of the fence to the pump, but the well-beaten and well-marked pathway was easily discernible from the roadway.

The farmer Spatz conveyed the land to Williams about February 1, 1929. Williams, however, was cashier of the Citizens State Bank of Earlham, and the purchase was in fact made for the bank. The bank later passed into the hands of a receiver.

It appears that in March, 1929, after the purchase of the farm by Williams, 200 feet of pipe was renewed on the farm by the plaintiff. In September, 1930, the water was shut off by the defendants. The steps were torn down and the pump was taken out of the south spring. This was done on or about the 7th day of September, 1930. It appears that the bank closed on the 5th day of December, 1930.

Suit was then brought by the plaintiff to restrain the defendants from interfering with the use of the water by the plaintiff. The trial court issued a decree, restraining all of the defendants from in any manner interfering with the plaintiff's rights under its easement to pipe away or pump and carry away

water from the springs. It is from this decree that the defendants appeal.

I. The appellants' argument contains the following:

"The record shows that appellee made the so-called improvements under an express agreement which was that appellee could have the surplus water after it was carried off of appellant's land through overflow pipes."

It is not contended by the appellant that the agreement hereinbefore referred to between the cement company and the then landowner in 1923 in relation to piping the surplus water not needed by the farmer to the premises of the plaintiff was not made. Apparently, the defendants concede that the plaintiff is entitled to the use of the surplus water, as the same passes through the pipes to the plaintiff's premises. It necessarily follows that the plaintiff would be entitled to go upon the land for the purpose of repairing the tanks, pipes and other equipment used in carrying the overflow to the plaintiff's premises.

It follows that the court correctly ruled in relation to the overflow water.

II. The appellant strenuously contends there never was any agreement made whereby the employees of the plaintiff were to be permitted to enter the premises of the farmer and carry water therefrom.

The oral agreement in reference to piping the surplus water from the farm to the premises of the cement company was made about the year 1923.

It appears from the record that the path was not used to the south spring until sometime in 1929. Prior to that time, the cement company had a spring on their own premises, which supplied at least a major portion of the water necessary for the camp houses and residences at the cement works.

The burden is on the plaintiff in reference to this claimed easement. The record has been searched with care, and we are unable to find that any agreement was ever made between the landowner and the cement company granting a right to the cement company or its employees to go into and over the feed lot to the south spring pump and carry water therefrom.

Section 10177 of the Code of 1927 provides as follows:

"10177. Footway. No right of footway, except claimed

in connection with a right to pass with carriages, shall be acquired by prescription or adverse use for any length of time.''

Moreover, we do not understand that the plaintiff is claiming under any right of prescription or adverse use, but rather, upon an oral contract. In connection with this claim, under the oral contract the plaintiff claims some expenditure of funds in the matter of the improvement at the south spring. Undoubtedly the owner of the farm knew that some of the employees of the cement company were going to the south spring for water and carrying it away.

It may be assumed from the record that the farmer knew that an officer of the cement company had expended small sums of money in repairs on the base on which the pump stood and perhaps in other regards, but nothing appears in the record inconsistent with a mere permissive use of the premises for the mere accommodation of the officers of the cement company and the employees.

The original agreement pertained only to the overflow of water from the springs, which overflow was to be piped from the feed lot across onto the roadway to the premises of the plaintiff company. It had no relation whatever to any permission to cross any portion of the feed lot for the purpose of access to the pump so that water could be pumped and carried therefrom.

It may be very fairly stated that whatever contributions were made to the improvement on and around the pump at the south spring by the cement company were merely expended for the accommodation and convenience of the officers of the company and their employees, but not made as a part of or a consideration for any contract creating any right or easement in the feed lot or the farm of which it was a part. At most, the privilege accorded to the plaintiff company and its employees was a mere naked license, revocable at will. See Cook v. C. B. & Q. Ry. Co., 40 Iowa 451; McBride v. Bair, 134 Iowa 661; Black v. Whitacre, 206 Iowa 1084 (l. c. 1088) ; Culver v. Converse, 207 Iowa 1173.

We think the trial court erred in that portion of the decree which prohibits the landowner from interfering with the officers, agents or employees of the cement company in passing onto and over the feed lot to the pump and pumping and taking

water away therefrom. The decree will be modified according-ly.—Modified and affirmed.

FAVILLE, C. J., EVANS, MORLING, and KINDIG, JJ., concur.